IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| | : | |
| v. | : | 2:26-cr-147 |
| | : | |
| MALACHI WITHERSPOON | : | |
| | : | |

**MEMORANDUM OPINION**

Defendant Malachi Witherspoon is charged with possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). Witherspoon has moved to suppress the firearm recovered by Philadelphia police, as well as certain incriminating statements made during his arrest. After a hearing, and for the reasons set forth below, Witherspoon's Motion is granted.

## I. FACTUAL BACKGROUND

In January 2026, Defendant Witherspoon was walking with two other men along the 2300 block of W. Indiana Avenue in North Philadelphia. This area is policed by the Philadelphia Police Department's 39th District and is considered a high-crime area. Tr. 8:4-8, 66:1-3, 124:12-14, Aug 10, 2026. Plainclothes Philadelphia Police Officers Dustin Kology (Kology) and Matthew Stasik (Stasik) were on routine patrol in an unmarked police vehicle when they observed all three men walking eastbound on W. Indiana Avenue.[1] According to the Philadelphia Police Department

[1] Officers Kology and Stasik each have over a decade of experience in the 39th District and have each made hundreds of gun arrests during their time with the Philadelphia Police. Tr. 8:3-8; 93:6-8.

Vehicle/Pedestrian Investigation Report (75-48A, Gov't Ex. 8), and hearing testimony, Officers Kology and Stasik slowly approached the group from behind while operating in the roadway. This orientation placed Officer Kology, who was driving the unmarked vehicle, closest to the sidewalk where Witherspoon was walking.

Officer Kology testified that he observed Witherspoon wearing "a red garment on his head and a black and gray sweater [with] a kangaroo pouch where you can put both hands through." Tr. 10:20-23, Aug 10, 2026. Officer Kology further testified that once the vehicle was parallel with Witherspoon and his associates, he observed that Witherspoon's "pocket area was heavily weighed down." *Id.* 11:6. Kology testified that based on his training, the size and apparent weight of the object in Witherspoon's sweater pocket was consistent with a firearm. *Id.* at 11:7-8; Gov't Ex. 8 at 1.

Officer Kology rolled down his window, showed his badge and asked Witherspoon whether he had a firearm or a permit. Tr. 11:25-12:6, Aug 10, 2026. Witherspoon, unknown to the officers at the time of this encounter, responded with a single "no." *Id.* at 36:6, 68:3-12; Def.'s Br. at 2. Notably, one of the men walking with Witherspoon responded, "I ain't showing you shit" and kept walking. Gov't Ex. 8 at 1; Tr. 13:7-12 Aug. 10, 2026. The third man remained close to Witherspoon while using his cellphone.

According to Officer Kology, Witherspoon then—unprompted—lifted his sweater to show his waist. Tr. 12:6-24, Aug. 10, 2026. Officer Kology testified that Witherspoon used both hands and lifted the sweater while "holding on to what was

in his pocket." *Id.* at 12:6-15, 15:6-7. Officer Kology also testified that the way in which Witherspoon lifted his pocket raised his suspicion that it contained a gun. *Id.* at 13:20-21. Kology further testified that based on his experience, "most people will either keep [guns] in their waistband or in their hoodie pocket. *Id.* at 14:2-3.

Next, Officer Kology exited his vehicle, initiated his body worn camera, and ordered Witherspoon to take his hands out of his pockets.[2] *Id.* at 15:12-15; Gov't Ex. 8 at 1. Witherspoon complied but kept his hands tense at waist level near the front of his sweater. Tr. 56:16-23, 62:4-14 Aug. 10, 2026. The Government concedes that once Kology exited the vehicle and demonstrated this show of authority, Defendant was seized and not free to leave. Gov't Br. at 7. According to Kology, Witherspoon appeared nervous after he exited his vehicle. *Id.* at 17:1-5.

At this point, Officer Stasik exits the passenger side of the vehicle to assist with the stop. Tr. 76:4-7, Aug. 10, 2026. Officer Kology walks towards Witherspoon, reaches directly for the sweater pocket where he observed the object and felt what he believed to be a firearm. Def.'s Br. at 2; Tr. 15:20-23, Aug. 10, 2026. A struggle then ensued. Def.'s Br. at 3. During the struggle, Kology's body worn camera depicts a black and silver firearm in Witherspoon's left hand. Tr. 15:21-23, Aug 10, 2026.[3] Kology then struck Witherspoon in the face to subdue and detain him. The gun

---

[2] Officer Kology's body worn camera was on standby mode while he was seated in the car during his initial interaction with Witherspoon. Tr. 16:4-6, Aug 10, 2026. Accordingly, the beginning of the body worn camera footage depicts video only without sound. Officer Kology testified that he initiated the sound once he stopped Witherspoon. *Id.* at 10-13.

[3] The Government argues that Witherspoon reached into his pocket during the frisk and removed the weapon in an attempt to toss it behind Kology to the man he was standing closest to. Gov't Br. at 6.

landed on the sidewalk and Stasik was able to quickly recover the weapon. *Id.* at 76:10-12.

Ultimately, Witherspoon was taken to the ground and handcuffed. *Id.* at 83:5-12. While handcuffed, Witherspoon repeatedly explained that the weapon is not his and that he just came home from jail. *Id.* at 40:19-41:9; Def.'s Br. at 3-4. Later, after police backup had arrived, Officer Kology escorted Witherspoon towards a marked police cruiser where Witherspoon engages in further conversation and states that his fingerprints are not on the gun. Def.'s Br. at 4. After the arrest, Officer's conducted an NCIC/PCIC[4] query of Witherspoon and determined that he does not have a permit to carry a concealed firearm, that he has prior felony convictions, and that the gun recovered during his arrest is not registered to him. *Id.*

In March of 2026 the Government adopted this case from the Philadelphia authorities. Witherspoon now stands charged with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He has moved to suppress the weapon and the recorded statements after his seizure and arrest. After briefing and a suppression hearing, Witherspoon's Motion is ripe for consideration.

---

[4] National Crime Information Center/Pennsylvania Crime Information Center.

## II. DISCUSSION

### a. Legal Standard

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. This guarantee requires that "all searches and seizures must be reasonable." *United States v. Rashwan*, 684 F. Supp. 3d 347, 353 (E.D. Pa. 2023) (Schmehl, J.) (citing *Kentucky v. King*, 563 U.S. 452, 459 (2011)). Generally, for a search or seizure to be reasonable … it must be effectuated with a warrant based upon probable cause." *United States v. Bey*, 911 F.3d 139, 144-145 (3d Cir. 2018). However, our Fourth Amendment jurisprudence recognizes a continuum of custody ranging from: (1) wholly voluntary encounters, to; (2) brief investigative detentions grounded upon reasonable, articulable suspicion, to; (3) arrests or full-blown searches—proper only when an officer has probable cause.[5] *See United States v. Vick*, No. CV 1:19-CR-216, 2021 WL 1821715, at *2 (M.D. Pa. Jan. 5, 2021), *report and recommendation adopted*, No. 1:19-CR-00216, 2021 WL 1812684 (M.D. Pa. May 6, 2021) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)); *see also United States v. Brown*, 765 F.3d 278, 288 (3d Cir. 2014).

---

[5] Notwithstanding defense counsel's closing remarks at the August 10, 2026, suppression hearing, the third category is not implicated in this matter.

Interactions that occur on liberty's end of the continuum are often referred to as "mere encounters." *See United States v. Giles*, No. 1:18-CR-0068, 2019 WL 1354149, at *2 (M.D. Pa. Mar. 26, 2019). Mere encounters do not implicate the Fourth Amendment because they involve no coercion or detention. *Id.*; *Brown*, 765 F.3d at 288 (citing *Florida. v. Bostick*, 501 U.S. 429 (1991)). "Police officers are free to walk up to citizens in public and engage in discussion or ask them questions, as the law presumes this encounter to be consensual as long as the reasonable citizen would feel free to disregard the officers and go about their business." *United States v. Marrero*, No. 21-CR-10-JMY-1, 2021 WL 5882103, at *3 (E.D. Pa. Dec. 13, 2021) (Younge, J.); *Bostick*, 501 U.S. at 434. Stated differently, "as long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *see also United States v. Goerig*, 111 F.4th 276, 279-280 (3d Cir. 2024).

A mere encounter graduates to the level of a seizure when, by means of physical force or a show of authority, a person's freedom of movement is restrained. *See United States v. De Castro*, 905 F.3d 676, 679 (3d Cir. 2018), *writ denied*, 586 U.S. 1167 (2019). This level of detention is generally referred to as a *Terry* stop. *See Brown*, 765 F.3d at 288. Courts have identified several relevant factors that inform whether seizure, as opposed to a mere encounter, has occurred. These factors include "the threatening presence of several officers, the display of a weapon by an officer,

some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *De Castro*, 905 F.3d at 679 (citing *Mendenhall*, 446 U.S. at 554).

Under *Terry* and its progeny, an officer may only engage in this sort of brief detention "when he has a reasonable, articulable suspicion that criminal activity is afoot." *Goerig*, 111 F.4th at 279 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). These warrantless seizures must be supported by more than an inchoate and unparticularized suspicion or hunch of a crime. *See United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000) (quoting *Terry*, 392 U.S. at 27). *Terry* stops "must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981).

When evaluating the Constitutionality of a *Terry* stop, courts look to "the totality of the circumstances, asking if a reasonable, trained officer standing in the officer's shoes could articulate specific reasons to justify the seizure." *Goerig*, 111 F.4th at 279; *see also Bey*, 911 F.3d at 145 (observing that warrantless seizures are *per se* unreasonable unless the Government satisfies its burden of establishing that each aspect of the detention was justified by reasonable suspicion). Court's "afford significant deference to [law enforcement's] determination" in this space. *Vick*, 2021 WL 1821715, at *4. An officer's reasonable suspicion of criminal activity may derive from his observation of exclusively legal activity. *Ubiles*, 224 F.3d at 217. Contextual considerations surrounding the stop such as location and time or whether the suspect is making furtive movements to conceal contraband, all inform an officer's common-

sense inferences about human behavior. *See Brown*, 765 F.3d 278, 290; *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002).

**b. Analysis**

As an initial matter, the parties agree that a seizure occurred the moment Officer Kology exited his vehicle. Tr. 114:15-24, 126:16-22, Aug 10, 2026; Gov't Br. at 7.[6] Witherspoon's brief advances two principal arguments in support of his Motion. First, Witherspoon asserts that any level of intrusion violated his constitutional rights because the officers did not see a firearm. Def.'s Br. at 6. Witherspoon further argues that "the purported observation, from a moving vehicle that Mr. Witherspoon had a 'weighted object' in his front hoodie pocket [cannot] overcome the absence of other circumstances that would typically lead an officer to reasonably believe that an individual is armed." *Id.* at 6-7.

Next, Witherspoon asserts that even if Kology did observe the imprint of a firearm in his sweater pocket, individuals are generally permitted to carry firearms pursuant to the Second Amendment. Witherspoon's argument follows that absent a reasonable and articulable suspicion of non-licensure or prohibited status, there was no predicate criminality to support the *Terry* stop. Def.'s Br. at 8-9.

In a post-*Bruen*[7] world, Witherspoon's Second Amendment argument is persuasive. Suspicion that a person is armed, without incorporating consideration of

---

6 The Government's concession regarding *when* the seizure occurred is key to this analysis.

7 *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) (holding that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside of the home).

the legality of the suspected gun possession, does not satisfy *Terry*. *See generally* Amanda Savage, *The Pseudoscience of Gun Hunting*, 126 Colum. L. Rev. 335, 379-380 (2026). This is particularly true in states like Pennsylvania, where there is no presumption of non-licensure. *See Commonwealth v. Hicks*, 208 A.3d 916, 937 (Pa. 2019); *Ubiles*, 224 F.3d at 217-218 (viewing *Terry*'s reasonable suspicion of criminality requirement through the lens of the jurisdiction in which the stop occurred); *United States v. Lewis*, 672 F.3d 232, 239-240 (3d Cir. 2012) (observing that a particular jurisdiction's presumption of licensure is critical to the totality of the circumstances analysis); *cf. United States v. Wilson*, 143 F.4th 647, 656 (5th Cir. 2025) (observing, notwithstanding Louisiana's presumption of non-licensure, such a presumption of illegality is inconsistent with the Constitution's history and tradition).

In *Hicks*, the Pennsylvania Supreme Court held that allowing an officer to approach and briefly detain an individual specifically to investigate whether they are properly licensed to possess a concealed firearm in public contravened the requirements of *Terry* and subverted the fundamental protections of the Fourth Amendment. *Commonwealth v. Hicks*, 208 A.3d 916, 947 (2019). Thus,

> unless an officer has prior knowledge that a specific individual is not permitted to carry a concealed firearm, and *absent articulable facts supporting reasonable suspicion that a firearm is being used or intended to be used in a criminal matter*, there is simply no justification for the conclusion that a mere possession of a firearm, where it lawfully may be carried, is alone suggestive of criminal activity.

*Id.* at 937 (emphasis added) (citation modified). In short, officers in Pennsylvania may not conduct a *Terry* stop for the sole purpose of viewing a person's license to

legally carry a firearm. Accordingly, there exists no constitutionally permissible reason to believe that anyone carrying a firearm is anything but a law-abiding citizen. *Id.* at 944-945; *See also* Brandon del Pozo & Barry Friedman, *Policing in the Age of the Gun*, 98 N.Y.U. L. Rev. 1831, 1858 (2023).

Against this backdrop, the critical issue for this Court is whether the Government has established that Kology's pre-detention observation and interaction with Witherspoon supports the reasonable suspicion Witherspoon was carrying a firearm in violation of the law. This Court believes that it has not.

First, it is uncontested that prior to this encounter, Witherspoon and his associates were unknown to the officers and there was no suspected criminal activity associated with the group. That said, the Court accepts Kology's testimony that he saw something weighted in Witherspoon's front sweater pouch as he pulled alongside of the three men.[8] Truthfully, that object could have been anything. But based on "the heavy shape [and] the weight in his hoodie" Kology believed it was a firearm.[9]

---

[8] This Court questions how the officers could have observed the weighted object in Witherspoon's front hoodie pocket while approaching him from behind. Nevertheless, the Court will accept that they were able to observe the pocket as they drove parallel to Witherspoon while he was walking. Officer Stasik also testified that he saw a weighted object in Witherspoon's sweater pocket during Kology's initial questioning from the unmarked vehicle. Tr. 106:15-107:18, Aug 10, 2026.

[9] Nothing in Kology's questioning of Witherspoon about whether he had a gun, or a valid permit to carry one, was compulsory. *Banks v. Gallagher*, 686 F. Supp. 2d 499, 521-522 (M.D. Pa. 2009) (observing that even suspect's subjective belief that they were detained does not change an objectively voluntary encounter into a seizure). While both officers maintain that this questioning was directed at Witherspoon specifically, the non-mandatory nature of this mere encounter is evidenced by the fact that one of Witherspoon's acquaintances, apparently unaware that Kology was speaking to Witherspoon, responded to Kology's question by saying "I ain't showing you shit" and kept walking. Gov't Ex. 8 at 1. The body worn camera shows this individual farther down the block after Witherspoon has been handcuffed and the officers did not engage with him at all. This tends to support Kology's view that had Witherspoon answered his questions differently (or perhaps not answered at all), Kology would not have had enough for the Terry stop. Tr. 66:4-14, Aug. 10, 2026.

Tr. 60:3-17, Aug. 10, 2026. Kology decided to ask if Witherspoon had a firearm or had a permit. *Id.* at 12:5-6. Notably, these questions were asked as a single, compound question. According to Kology, Witherspoon responded with a singular "no." *Id.* at 12:6. Witherspoon then lifted his sweater by grabbing the unidentified object to show that he did not have a firearm. *Id.* at 66:24-67:2. For the Government to prevail, these facts, combined with their presence in a high-crime area, must establish reasonable suspicion.

The Government places great weight on Witherspoon's response to Kology's firearm inquiry; referring to Witherspoon's "no" as an "obvious lie." Gov't Br. at 9. Kology's inquiry was asked as a compound question—combining two separate questions into one. Tr. 52:18-25, Aug 10, 2026. The Government's briefing flatly ignores this point.[10]

The Government asserts that Officer Kology "asked the defendant whether he possessed a firearm. The defendant lied, saying 'no.' Officer Kology also asked the defendant whether he possessed a permit to carry a firearm. The defendant's response 'no' to that question provided additional information to the officers as they evaluated the situation." Gov't Br. at 9. This argument conflicts with Kology's record testimony that he "asked [Witherspoon] if he had a firearm or a permit." Tr. 12:4-6, Aug 10, 2026.

---

[10] The Government was corrected on this point several times. Tr. 67:17-68:12, 70:2-24, Aug. 10, 2026. After his arrest, Kology asks Witherspoon directly if he has a permit to carry, to which Witherspoon answers no. This post-seizure/post-arrest exchange does not factor into the Court's analysis of whether Kology has reasonable suspicion to detain Witherspoon under *Terry* in the first place.

To be sure, misleading, contradictory, or inconsistent statements can give rise to reasonable suspicion. *Vick*, 2021 WL 1821715, at *3 (citing *United States v. Green*, 897 F.3d 173, 185 (3d Cir. 2018)). "But an incomplete statement is not necessarily contradictory or inconsistent." *Green* 897 F.3d at 185 (citation modified). At the time Witherspoon responds "no" to officer Kology's compound question, there is nothing objectively contradictory or misleading about the answer. To the extent anything is confused about this interaction, it is Kology's compound question—which can only be fully answered by a compound response. Kology's following testimony on cross-examination is instructive:

> **Q [Defense Counsel]**: Okay. So when you asked Mr. Witherspoon that question of whether he had a permit to carry or was carrying a firearm, you were not aware of whether or not Mr. Witherspoon actually had a permit to carry; is that fair?
>
> **A**: No, I believed he didn't have permit to carry because when I first asked him he said no.
>
> **Q**: Right, but he said no to not having a firearm or a permit to carry?
>
> **A**: That's correct.
>
> **Q**: A compound question, right?
>
> **A**: Yes, sir. …
>
> **Q**: All right, so no one had called any anonymous tips about young men, young black men with firearms that day?
>
> **A**: Nobody called.
>
> **Q**: Okay, so the only thing that drew your attention was that initial bulge in the pocket of Mr. Witherspoon?
>
> **A**: That's Correct.

Tr. 57:5-24, Aug. 10, 2026. And then on re-direct:

> **Q [Government]**: Okay so if you had said do you have a firearm and he answered yes, what would you have done?
>
> **A**: [I] would have made it more clearly after the fact, sir, do you have a permit to carry. And then, given his answer on that, would have went from there. …
>
> **Q**: So is it the fact that the Defendant lied about both those things did that heighten your suspicion even more?
>
> [OBJECTION. SUSTAINED]
>
> **Q**: So based on the Defendant's answer of no, what did you take that to mean?
>
> **A**: That he had an illegal firearm due to – and also the question, his answer, and then the way he just lifted it up on his own still holding on to that object.

*Id.* at 70:20-71:10.

These exchanges demonstrate that Kology relied wholly on his belief, or hunch, that the object in Witherspoon's sweater was a gun, combined with his response "no" to an unclear question. Thus, at that point in the encounter, Kology's objective justification for initiating a *Terry* stop was (1) the sight of a weighted object in Witherspoon's sweater; (2) his voluntary verbal statement that he did not have a firearm; (3) and Kology's disbelief of that statement based on the way Witherspoon lifted his sweater by holding onto the contents of his pockets. This, even combined with the high-crime environment of a stop, is not enough to establish reasonable suspicion.

In support of its position, the Government cites just one case in *Brown*. 765 F.3d 278. The Government asserts that officers Kology and Stasik had even more information than the officers that effected a *Terry* stop in *Brown*. In this Court's view a close examination of the facts in *Brown* serves to weaken the Government's position in this case.

There, officers observed the defendant in the early morning hours park outside of a nuisance bar known for shootings and drug dealing. *Brown*, 765 F.3d at 284. As defendant exited his vehicle, he appeared to notice the detectives, at which point he sat back in his car and made a motion consistent with removing an object from his waistband and placing it beneath the driver's seat. *Id.* The detectives exited their vehicle and approached defendant and the other passengers. One detective informed the defendant that his car was illegally parked. During this conversation another detective shined a flashlight through the car's windshield and observed the grip and rear slight of a gun sticking out from underneath the driver seat. *Id.* The detective speaking to the defendant then detained him to prevent him from fleeing and asked whether he had a permit to carry the firearm. When defendant stated that he did not, he was arrested. *Id.*

The encounter between Kology and Witherspoon bears no resemblance to the facts of *Brown*. In *Brown* the officers testified that the defendant returned to his vehicle and made movements consistent with hiding a firearm under his seat after he noticed they were in his vicinity. During a mere encounter regarding a parking violation, one of the officers noticed the firearm in plain view in a location consistent

with their prior observation of defendant. At that point, the defendant was seized and asked directly if he had a permit to carry the gun.[11]

Here, Officers Kology and Stasik did not see a gun until Witherspoon removed it from his pocket *after* he was seized.[12] The post-detention observation of the firearm here sets these circumstances apart from *Brown* where the firearm was observed during the mere encounter, thus directly contributing to the officers' reasonable suspicion. Next, this case contains no testimony that Witherspoon attempted to remove a weapon from his person and conceal it elsewhere pre-detention. While Kology did testify that Witherspoon grabbed the front of his sweater pocket to lift his sweater and show his waist, this is not sufficiently parallel to the "furtive movements consistent with an [objective] attempt to conceal a weapon" present in *Brown*. 765 F.3d at 790; *compare United States v. Hoover*, No. CR 17-525 (SRC), 2020 WL 859331, at *5 (D.N.J. Feb. 21, 2020), *aff'd*, 857 F. App'x 721 (3d Cir. 2021) (citing *United States v. Arzola*, 361 F. App'x 309, 311 (3d Cir. 2009)) (acknowledging a gun hidden in an alcove close to defendant's residence is indicative of guilty knowledge that he was prohibited from possessing firearm).

[11] Citing *Ubiles*, the panel in *Brown* acknowledges that "there may be some circumstances where simple knowledge of a firearm does not provide reasonable suspicion for a *Terry* stop. *Brown*, 765 F.3d at 290. Brown was decided eight years prior to *Bruen* and five years prior to *Hicks*. Therefore, in a post-*Bruen*/post-*Hicks* environment, the defendant's seizure in *Brown* may have undergone a different analysis.

[12] It goes without saying that it is incredibly dangerous for everyone involved, including Witherspoon, to remove a concealed weapon from your person while engaged with an officer who is in close proximity. In truth, the officers in this matter demonstrated incredible restraint in subduing Witherspoon without further injuries or use of their service weapons.

Additionally, in *Brown* the officers obtained a clear answer as to whether the defendant had a permit to carry. Moreover, the officers confirmed the presence of a gun. Here, Kology and Stasik did not confirm the presence of a gun pre-detention, but they also never received a coherent response to their compound possession/permit question.[13] *Cf. United States v. Tyreese G. Williams*, No. CR 25-529, 2026 WL 2455784, at *2 (E.D. Pa. Aug. 21, 2026) (finding that officers lawfully seized firearm where they asked suspect prior to his flight or discovery of a firearm, whether or not he was on parole). These circumstances simply lack the objective justification present in *Brown*.

Even if Kology were somehow able to divine the fact that the object in Witherspoon's sweater was a firearm, he certainly lacked the objective justification to discern whether that firearm was illegal. Behind the veil, this seizure amounts to little more than a stop to determine whether Witherspoon was licensed to carry—prohibited by the reasonable suspicion requirements for illegal firearms pronounced in *Hicks*', *supra*.

Separately, Kology testified that upon exiting the vehicle he feared for his and his partners safety. Tr. 61:23-62:14, Aug. 10, 2026. Officer safety is a paramount consideration with respect to *Terry* stops. But Witherspoon's stop falls outside of the category of protective pat downs where the impetus for a frisk is officer safety. *See*

---

[13] In this Court's view, Witherspoon's instinct to lift his sweater and show his waist band is proof positive that he was responding to the first part of the compound question; whether he had a firearm. The suggestion that Witherspoon's answer was in any way fully responsive to the second portion of Kology's inquiry—whether he had a permit—is belied by the testimony.

*e.g. United States v. Hill*, 811 F. App'x 761, 763 (3d Cir. 2020) (recognizing that seizure and protective frisk is constitutionally justified where suspect repeatedly returned his hands to pockets, despite several requests not to). Again, the Government concedes that Witherspoon was seized the moment Kology exits his car. Any post-seizure safety concerns, while justified, do not factor into the proffered objective justifications for reasonable suspicion that caused Kology to exit the car in the first place. The officers consistently testified that they stopped Witherspoon because they believed he had an illegal firearm. Tr. 62:4-6, Aug. 10, 2026.

Finally, this Court recognizes that its inquiry "is not what course of conduct the [officers] should have pursued, but whether their actions were constitutionally permissible." *Brown*, 765 F.3d at 289 n.6. On the latter score, this Court believes they were not. However, the Court is obliged to acknowledge that the officers could have asked to follow up questions for clarification prior to exiting the vehicle. To the extent Witherspoon was cooperating with the mere encounter, the officers could have sussed out more details, potentially building an objective justification for reasonable suspicion. Like *Williams* above, officers could have asked Witherspoon whether he was on probation or parole, or more simply, asked Witherspoon to see what was in his pockets. *See United States v. Roberson*, 90 F.3d 75, 81 (3d Cir. 1996) (observing that the police are not powerless and can use initial information as the basis for further investigation and conversation); *see also United States v. Kalb*, No. CR 16-12, 2016 WL 6211709, at *2 (E.D. Pa. Oct. 24, 2016) (McHugh, J.) (same).

## III. CONCLUSION

Ultimately, the officers' instincts in this matter were correct; Witherspoon was carrying a firearm in violation of the law. Nevertheless, the fact that their police work resulted in the removal of a dangerous firearm from improper hands does not alter the constitutional analysis. The protections afforded by our Charter apply notwithstanding the success of law enforcement's crime-fighting efforts.

For the foregoing reasons, this Court will grant Witherspoon's Motion to Suppress all evidence derived from his unlawful seizure. An appropriate Order of Court will follow.

BY THE COURT:

GAIL A. WEILHEIMER, J.